**SIGNED THIS: April 5, 2012**

_____
**Thomas L. Perkins**
**United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SUSAN M. KRIEGER, | ) | Case No.  11-80144 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| SUSAN M. KRIEGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No.  11-8010 |
| | ) | |
| EDUCATIONAL CREDIT MANAGEMENT | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**O P I N I O N**

This matter is before the Court for decision after trial on the complaint filed *pro se*

by the Debtor, Susan M. Krieger (DEBTOR), against Educational Credit Management

Corporation (ECMC), seeking to discharge her student loan obligations pursuant to section

523(a)(8)(B) of the Bankruptcy Code.  11 U.S.C. § 523(a)(8)(B).  The issues are limited to

whether the DEBTOR'S current inability to make payments on those obligations are likely to persist and whether the DEBTOR has made a good faith effort to repay the loans.

## FACTUAL BACKGROUND

The DEBTOR is fifty-two years old and in good health.  Upon graduating from high school in 1978, she married her first husband.  When that marriage ended, she was awarded custody of their only child.  She worked in clerical or secretarial positions until 1983, when she took a job as an inventory control clerk.  The DEBTOR remarried in 1986, leaving her job to be a homemaker.  She remained at home until 1992, when she began doing bookkeeping for her brother on a part-time basis.  She attended community college, on a part-time basis, from the fall of 1989 to the spring of 1992, taking classes in accounting, but had to quit when her family moved because of her husband's job.

When they moved back to St. Louis in 1993 or 1994, she resumed working for her brother.  She completed a two-year degree in the summer of 1999 from St. Charles Community College, with an Associate of Arts degree in Business and Accounting.  In 2000, the DEBTOR enrolled at Webster University in Webster Groves, Missouri, to pursue a paralegal degree.  She financed her education there, in part, by obtaining five separate loans.  The dates, original amounts disbursed and original interest rates on the five loans are as follows:

| Loan Date | Original Loan Amount | Interest Rate |
|-----------|----------------------|---------------|
| Aug. 28, 2000 | $5,000.00 | 2.820 |
| Aug. 28, 2000 | 5,500.00 | 2.820 |
| Feb. 16, 2000 | 4,416.00 | 5.390 |
| Nov. 9, 2001 | 5,500.00 | 2.820 |
| Nov. 9, 2001 | 5,000.00 | 2.820 |

The DEBTOR obtained a certificate in paralegal studies in December, 2000, and completed a Bachelor of Arts degree with a major in legal studies in August, 2002, with a cumulative grade point average of 3.86. As a student, the DEBTOR worked as an intern with the federal district court in 2001. She was named the "most valuable paralegal" and was a member of Phi Theta Kappa. She began actively soliciting employment as a paralegal in 2001. She also sought employment for other positions, including as a deputy clerk with the U.S. District Court and an account clerk with the City of Clayton, Missouri.

The DEBTOR and her second husband divorced in 2001. Her husband was awarded custody of the two children that were born of the marriage and who were then in high school. As part of the property settlement, she received a mutual fund account valued at $52,000 and her savings account with an approximate balance of $10,000. The DEBTOR was entitled to receive maintenance of $1,200 per month for a period of five years. The agreement provided that from those funds, the DEBTOR was to pay the monthly payments of $529.78 due Ford Motor Company on a vehicle lease signed by her husband for her car. The DEBTOR was liable for a portion of the post-secondary education expenses of her two younger children.[1] Though her husband was awarded the marital home and agreed to pay the mortgage, she remained there until 2005, for her children's benefit, until she could stay there no longer.[2] While she was residing there, she did not receive any maintenance, but her former husband paid for all of the household expenses, including groceries.

---

[1]Pursuant to the Joint Parenting Plan, which was incorporated in the divorce decree, the college expenses were to be apportioned according to the same percentages as child support is calculated under Missouri law.

[2]According to the DEBTOR'S testimony, during the time she was residing in the home with her former husband and children, she went to live with her oldest child for a short time, but returned because her younger children experienced problems.

Eventually, the DEBTOR permanently moved out of the former marital home, rented an apartment and continued her job search, living off of her marital settlement. Both her son, having graduated from high school in 2004, and her daughter, graduating the following year, attended college. Between themselves, she and her former husband renegotiated the terms of her alimony, reducing the amount to $650 per month, based on her responsibility for thirty percent of her children's college expenses. From that amount, she continued to be responsible for the $529.78 car payment. In 2005, she moved to Webster Groves and registered for classes in the masters in legal studies program, but cancelled her enrollment when she learned she would not be eligible for financial aid. Her apartment flooded in November, 2008, and lacking funds to remedy the problems which resulted from it, she moved to her mother's home in Dallas City, a small rural community of less than 1,000 people, located on the Mississippi River in West Central Illinois.

Although the DEBTOR'S job search began when she earned the paralegal certificate, it was unavailing. Upon graduation, she hoped to work in the area of criminal law. Her search for jobs in that field was aggressive. She sought jobs both on-line and with employment agencies and temp agencies. She looked for entry level paralegal positions with firms and in government offices all around the country. She responded to a wide variety of newspaper want-ads. The DEBTOR testified that she applied for at least one hundred eighty job positions over the past ten years, that she documented with copies of letters, without success. Unable to find a position as a paralegal, she attempted to locate employment outside her field, particularly in the areas of accounting and bookkeeping, with no success.

4

Since December, 2008, the DEBTOR has been residing with her mother in Dallas City, and is dependent upon her for support. Her mother is seventy-four years old, and apart from a small income from produce grown on a couple of acres, her only income is social security. The DEBTOR'S sole source of income is $200 per month in the form of SNAP Benefits.[3] The mutual funds account and savings account funds she was awarded in the 2001 divorce have been exhausted and she has no savings or investments of any kind. Her vehicle, which her former husband purchased for her at the termination of the lease, is over a decade old and is in need of repairs, which she cannot afford to make. She no longer has a cell phone. She has no health insurance and cannot afford medical or dental care. Because she could no longer afford internet service, her job search became more difficult and, based on the rural nature of where she lives, her opportunities diminished significantly.

The student loans first came due in November, 2003. The DEBTOR requested and obtained deferments from Sallie Mae for three years. In January, 2006, the DEBTOR applied for and obtained a forbearance. Similar requests were made and granted each year since. The loans have not been consolidated. While the DEBTOR was still in school, she made a large payment of $4,000 on March 19, 2001, with funds she was awarded in the divorce. Later that year, she made an additional payment of $297; in 2002 she made a single payment of $332; in 2003 she made a payment of $43; and the last payment was made in 2006 in the amount of $600. As of March 25, 2011, the total amount due on the loans was $24,185.75, with a per diem of $1.53.

---

[3]SNAP is the acronym for the Supplemental Nutrition Assistance Program operated by the Illinois Department of Human Services, formerly known as the Food Stamps Program.

The DEBTOR filed a Chapter 7 petition on January 24, 2011, reporting her current monthly income as $200.  The DEBTOR listed no non-exempt assets and listed no secured or priority creditors.  Unsecured claims totaled $30,450, of which $26,000 was listed as student loans.  The DEBTOR brought this adversary complaint, seeking a determination that her student loan debt was dischargeable on undue hardship grounds.  A trial was held on December 9, 2011, and the matter was taken under advisement by the Court.  ECMC filed a trial brief in advance of the hearing.

The DEBTOR was the only witness to testify.  She admitted that her job search efforts have dwindled to eight or so applications in 2010 and just a few on-line applications in 2011.  She holds out no realistic hope of finding employment and feels she is now permanently unemployed after so many years of unsuccessfully seeking work.  She remains willing, however, to take a job if offered to her.  Although she was ashamed to admit it, she is subsisting only through the charity of her family and the state.  Her son has given her a credit card to be used for emergencies, and  has paid her car insurance.  The DEBTOR testified that she tries not to be a burden to her mother, but to help her out in any way that she can.

**ANALYSIS**

Under section 523(a)(8) of the Bankruptcy Code, a student loan is not dischargeable unless "excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents."  The Seventh Circuit has adopted the three-part *Brunner* test, which requires the debtor to demonstrate by a preponderance of the evidence:

> 1. That the debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loans;

2.  That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

3. That the debtor has made good faith efforts to repay the loans.

*Matter of Roberson*, 999 F.2d 1132 (7th Cir. 1993) (adopting the analysis used by the court in *Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2nd Cir. 1987).  All three prongs must be established.  Failure to prove any one of the requirements brings the inquiry to an end and the student loan is not dischargeable.  *Goulet v. Educational Credit Management Corp.*, 284 F.3d 773 (7th Cir. 2002).  The Tenth Circuit reinterpreted the *Brunner* test in *Educational Credit Management Corp. v. Polleys,* 356 F.3d 1302, 1308 (10th Cir. 2004), criticizing the manner in which many courts have applied the *Brunner* test as too constrained and overly restrictive, resulting in denial of discharge "under even the most dire circumstances."  After reviewing the alternative "totality of the circumstances" test used by some courts, and noting the lack of decision-making guidance offered by that test, the court concluded as follows:

> We do not read *Brunner* to rule out consideration of all the facts and circumstances. Under the first aspect of *Brunner,* the bankruptcy court is to inquire about whether the debtor can maintain a minimal standard of living while repaying the debt.  This evaluation necessarily entails an analysis of all relevant factors, including the health of the debtor and any of his dependents and the debtor's education and skill level.  The second *Brunner* factor similarly requires an analysis of all the facts and circumstances that affect the debtor's future financial position.  Finally, the good faith part includes an analysis of the debtor's situation in order to determine whether he has made a good faith attempt to repay the loan by maximizing income and minimizing expenses.

> We therefore join the majority of the other circuits in adopting the *Brunner* framework.  However, to better advance the Bankruptcy Code's "fresh start" policy, and to provide judges with the discretion to weigh all the relevant considerations, the terms of the test must be applied such that

debtors who truly cannot afford to repay their loans may have their loans discharged. Additionally, we think that the good faith portion of the *Brunner* test should consider whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship.

The Seventh Circuit has indicated that for a hardship to be "undue," it must be more than mere "garden variety" hardship; "some major personal and financial sacrifices" are to be expected before hardship becomes undue. *In re O'Hearn,* 339 F.3d 559, 564 (7th Cir. 2003). In this Court's view, the Seventh Circuit, like the Tenth Circuit, permits debtors who truly cannot afford to repay their educational loans to discharge them, which is the purpose of section 523(a)(8).

**Future Inability to Repay**

ECMC concedes that the DEBTOR meets the first prong of the *Brunner* test. Given that concession, the Court addresses the second prong of the test which requires the DEBTOR to show that her inability to pay the loan while maintaining a minimal standard of living, will continue for a significant portion of the repayment period. As articulated by the Seventh Circuit, dischargeability must be based on a "certainty of hopelessness." *Matter of Roberson*, *supra*. Ordinarily, the debtor must show unique or extraordinary circumstances that make it likely that the inability to pay will persist unabated for an extended period of time. *Goulet v. Educational Credit Management Corp.*, *supra.* As a general rule, the second prong is a difficult hurdle early in the student loan's repayment period, but becomes less difficult to surmount with the passage of time. A long-standing record of financial difficulties, absent any basis for betterment, stands as a reliable forecast. *In re Armstrong,* 2011 WL 6779326 (Bankr.C.D.Ill.).

The DEBTOR testified that she has applied for more than 180 jobs since her graduation from Websters. From the many applications admitted into evidence, the DEBTOR'S focus upon graduation was to find work as a paralegal or to obtain a professional position in a related field. The Court finds that her job search has been extensive. Contrary to ECMC'S contention that her employment goals were not realistic and that she has been unwilling to seek work in a lesser capacity, in the fall of 2003, the DEBTOR responded to an ad placed by the Director of Placement for the Bar Association of Metropolitan St. Louis, for the position for a legal secretary. The following month she applied for work as a circulation clerk for a newspaper and for an administrative assistant in sales. The Court concludes that the DEBTOR'S attempts to obtain employment were bona fide and that she earnestly wanted to work. The DEBTOR'S concern that she would be unlikely to be hired as a paralegal today because her skills are stale is legitimate.[4]

ECMC criticizes the DEBTOR for concentrating her job search in "her chosen field, paralegal and/or accounting clerk type positions." The Court finds it ironic that one who obtains a specialized degree would be criticized for attempting to make full use of her education by finding a job in the field in which she is most highly qualified and in which her earning potential is greatest. ECMC relies upon *In re Healey,* 161 B.R. 389 (E.D.Mich. 1993), where a debtor who had used loans to finance her undergraduate degree and her Masters degree in education, with the hope to work as a teacher, filed for chapter 7 relief within a year of receiving her Masters degree. Prior to filing, she was employed at a parochial school making $10,000 per year. Although she had previously made twice that

---

[4]According to the record, the DEBTOR applied for at least eight jobs in 2010, four of which were for paralegal positions.

amount as a secretary, she preferred to work as a teacher despite the low pay. Quite sensibly, the court reasoned that a person who has a loan to repay cannot ignore reasonable higher paying options in order to work in "one's field of dreams, no matter how little it pays." *Id.* at 395. While this Court agrees with that reasoning, it has no applicability to the facts at bar. Rather than a situation where a debtor has refused to seek or turned down higher paying jobs to stay in a lower paying one, this DEBTOR has been unable to find work at all and has exhausted all reasonable options given her dire circumstances. She does not have a marketable set of skills that she can fall back on that are outside of her "field of dreams."

ECMC argues that there is no objective reason why the DEBTOR cannot work, as she is fifty-two years old with no dependents and suffers from no disability. But the second prong of the *Brunner* test requires a subjective prediction about the DEBTOR'S future. A bankruptcy court does not base its determination on what some hypothetical person with a debtor's major attributes might achieve. The determination is based on the Court's judgment about whether and where this particular debtor is likely to work in the future and what she is likely to earn in the future. The DEBTOR has depleted her savings and has no money of her own.[5] As she testified, the DEBTOR has been living very frugally for the past ten years. But for the help provided by her mother and son, she would be wholly dependent upon public assistance. While the DEBTOR recognizes that there are few employment opportunities in the Dallas City area, she is financially unable to relocate to a larger population center in order to enhance her job prospects.

---

[5]At trial, the DEBTOR testified that the balance in her mutual fund account was less than $500.

The DEBTOR'S employment history is grim and separates her case apart. According to her earnings record from the Social Security Administration, the most the DEBTOR has earned was $11,633 in 1985. The following year, she earned $5,070. From 1998 to 2009, her earnings totaled $18,829, with her highest earnings during that period being $3,840 for 2006.[6] Her lifetime earnings, upon which her social security benefits will be based, are $86,540. The Court finds that the DEBTOR has no reasonable likelihood of obtaining gainful employment in the reasonably foreseeable future.[7]

This Court has heard many student loan nondischargeability cases. Rarely has the Court seen the kind of persistent job search efforts in which this DEBTOR has engaged over the past decade. Never has the Court seen such utter futility be the result of a debtor's job search efforts. This DEBTOR is truly destitute and has been in these straits for many years without any respite. The Court carefully observed the DEBTOR as she testified, evaluating not only the substance of her testimony, but her appearance, demeanor, body language and overall attitude. Her intelligence is the only attribute that a neutral observer would characterize as positive. She has clearly been worn down by the difficulties she has experienced in her life, and it shows. If the term "certainty of hopelessness" is ever to have any application, it is in this case. The Court determines, based on the evidence heard at trial, that the DEBTOR has no hope of being able to repay the loans at any time in the foreseeable future, and that this absence of hope is as certain as can be predicted on the basis of evidence received at a trial.

---

[6] Her average annual earnings during this period was $1,569.

[7] In making this determination, the Court gives no credence to the DEBTOR'S contention that her degree from Webster University has not aided her in finding employment. In addition, the DEBTOR'S belief that her job prospects were hampered by an incident which occurred during her internship was unsubstantiated.

**Good Faith**

In order to satisfy the third prong of the *Brunner* test, the DEBTOR must demonstrate that she has made a good faith effort to repay the loans, measured by her efforts to "obtain employment, maximize income and minimize expenses." *Roberson*, 999 F.2d at 1136.   The record reflects that the DEBTOR paid off one of her loans while she was still in school, using $4,000 from her divorce settlement.   The DEBTOR made four payments totaling $1,272 between 2001 and 2006.   Though her income in 2006 was only $3,840, she made a payment of $600.   The DEBTOR has paid what she could.   Her failure to pay more cannot be considered bad faith, because she has not had the income or resources to make additional payments.   Prior to filing bankruptcy, the DEBTOR sought and received forbearances and deferments.   As the evidence at trial demonstrated, the DEBTOR actively sought employment opportunities outside her field, but has never been successful in obtaining a position.   This not a situation where a borrower played the bankruptcy card shortly after completing her subsidized education.   This is not a situation where she has lived an extravagant lifestyle while failing to pay the loans.   She has not intentionally created her financial hardship. She has not wilfully arranged her financial lifestyle in order to avoid her responsibility for the loans.   Based on these circumstances, the Court finds that the DEBTOR has made good faith efforts to repay her student loans and has satisfied the final prong of the *Brunner* test.

ECMC contends that the DEBTOR'S unwillingness to consider alternative repayment plans, such as the William D. Ford Income Contingent Repayment Plan or the Income Based Repayment program (IBR), evidences a lack of good faith effort to repay the loans.   According to ECMC, the DEBTOR would have no monthly payment under the IBR,

based on her 2010 adjusted gross income of $207. In accord with a majority of courts, this Court does not consider a debtor's failure to take advantage of such programs to be a dispositive factor. *In re Crawley*, 460 B.R. 421 (Bankr.E.D.Pa. 2011); *In re Bronsdon*, 435 B.R. 791 (1st Cir.BAP. 2010); *In re Benjumen*, 408 B.R. 9 (Bankr.E.D.N.Y. 2009); *In re Durrani*, 311 B.R. 496 (Bankr.N.D.Ill. 2004); *In re Grawey*, 2001 WL 34076376 (Bankr.C.D.Ill. 2001). A debtor who has been chronically unemployed over a period of years cannot be faulted for not considering a formal repayment program. A debtor whose ability to pay is nonexistent because she has no income, gains nothing from enrolling in a program that advises her that her payment obligation is $0 until her financial situation improves.[8] A lender's agreement to defer payments, while continuing to accrue interest, is of no help to a debtor who cannot be forced to pay because she is broke. Congress has not opted to make enrollment in such a program a condition of discharge and this Court will not read such a condition into the statute. *See Educational Credit Management Corp. v. Jesperson,* 571 F.3d 775 (8th Cir. 2009) (Bye, J., concurring in part and dissenting in part). Faced with the high likelihood of continuing unemployment, the DEBTOR is entitled to seek a discharge of her student loans even though she has not enrolled in a hardship program.

For the foregoing reasons, the Court finds that the DEBTOR has established each of the elements of the *Brunner* test and is entitled to a discharge of her student loans. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.[9]

---

[8] The DEBTOR testified that at one point she considered trying to consolidate the loans, but rejected the idea because she had no job.

[9] The complaint named three other Defendants: Sallie Mae, Inc., SLM Corporation and Albert L. Lord. On its motion, ECMC, alleging that it is the sole holder of the loans in question, was substituted in as a Defendant, but the original Defendants were never dismissed. The order will refer to all Defendants named in the complaint plus ECMC.

###